IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JUSTIN KRAFT and KRAFT PIANO
SERVICES, LLC,

                Plaintiffs,

v.

DENNIS ARDEN, Individually; NEW
OCTAVE CORPORATION, a domestic
corporation and d/b/a/ INTERNATIONAL
PIANO SUPPLY; and INTERNATIONAL
PIANO SUPPLY, INC., a domestic
corporation,

                Defendants.

CV. 07-487-PK

OPINION AND ORDER

PAPAK, Magistrate Judge:

       Plaintiffs Justin Kraft and Kraft Piano Services brought suit against Defendants Dennis

Arden, International Piano Supply and New Octave Corporation alleging claims for breach of

contract and interference with business relations.  This court has jurisdiction pursuant to 28

U.S.C. § 1332.  Defendants' motion for summary judgment is presently before the court.  The

court grants defendants' motion for summary judgment (#47) for the reasons set forth below.

Page 1 - OPINION AND ORDER

## STATEMENT OF FACTS

Defendant New Octave Corporation manufactures piano supplies and defendant International Piano Supply sells those supplies. Before 2006, New Octave and International Piano were two divisions of the same corporation. In 2006, International Piano became a separate corporation, owned by New Octave. Defendant Dennis Arden owns 85 percent of the stock of New Octave and serves as the president of both New Octave and International Piano.

In 2003 or early 2004, Plaintiff Justin Kraft incorporated Kraft Piano Services, LLC, a piano tuning and repair business in Florida. At the time, he served as a contractor for another piano repair operation and established Kraft Piano as a business entity to accept payment for his services. He is Kraft Piano's sole member and investor.

## I.    Facts Relevant to the Breach of Contract Claim

In 2003, Kraft Piano Services became involved with New Octave/International Piano initially because it purchased New Octave piano repair supplies. Kraft and Arden discussed business over the phone. In early 2004, Kraft received an inheritance, had some experience with Internet sales, and discussed potential business relationships with Arden. Although Kraft had no prior experience in the distribution of piano products, he and Arden discussed Kraft Piano Services as a potential distributor of New Octave products. New Octave had other distributors at that time, including its sales division, International Piano.

### A.    Discussions Between Kraft and Arden

Kraft testified that Arden, acting as a  representative of New Octave or International

Piano or both[1], entered into an oral agreement with him and Kraft Piano.  Under the oral agreement as Kraft described it, New Octave would grant an exclusive distributorship and refer International Piano customers to Kraft and give Kraft a customer list of New Octave's "retail end-users" once Kraft had "enough inventory and infrastructure in place to handle the current volume of orders."  In addition, Kraft asserts that the agreement obliged Kraft Piano to maintain a minimum order commitment, based on current replenishment orders.   Kraft also indicated that, if Arden did not believe that Kraft Piano was ready handle New Octave customers, the agreement obliged Arden tell Kraft the additional tasks he needed to accomplish.

    Arden's description of the discussions he had with Kraft, however, differs markedly from Kraft's account.  Arden's testimony indicated that Kraft had to have a minimum amount of inventory and orders before Arden would even consider him as an exclusive distributor.  Arden also testified that, although he discussed his customer lists with Kraft, he never offered the lists to Kraft or agreed that Kraft would be an exclusive distributor.

    In May of 2004, Kraft traveled to Astoria, Oregon to discuss potential business relationships with Arden.  Arden paid for Kraft's hotel, meals and transportation because he contemplated that Kraft would start purchasing New Octave products for resale.  Kraft signed a non-compete agreement while he was there.  The agreement provided that Kraft would not "engage in any competitive business or enterprise" nor would he "assist or attempt to assist any third party to compete with" New Octave for a period of at least three years.

---

[1] Kraft was uncertain of the relationship between Arden, New Octave and International Piano. Undisputed facts demonstrate, however, that at the time of the purported agreement, International Piano was merely a division of New Octave and that Arden was president of New Octave.

Page 3 - OPINION AND ORDER

Kraft's testimony conflicts regarding when he and Arden entered an oral agreement for an exclusive distributorship. Kraft testified that, during the Astoria trip, Arden showed Kraft how his operation worked but did not get into the specifics of any agreement. Kraft, however, also testified that he and Arden got into detailed discussions during his visit and that, when he left Astoria, he understood that he had an exclusive distributorship arrangement with New Octave. He further testified that they had the "fundamentals" then but the terms were to be negotiated.

In any event, Kraft left Astoria without a written agreement. Kraft did, however, have a distributor price list for New Octave piano supplies. In addition, after the trip, Arden sent Kraft a sales history for New Octave items sold by International Piano from January 2003 until October 2004.

Kraft could not identify the specific terms of the oral agreement. He could not specify how much volume Kraft Piano had to have the capacity to meet before Kraft Piano became an exclusive distributor or New Octave would refer customers, but he indicated that the International Piano sales history provided the benchmark. Kraft also testified that the agreement included a minimum monthly order requirement but the parties did not set a precise amount and instead again referred to the sales history as a benchmark. Kraft also indicated that the agreement required that he have enough stock to handle orders, but they had not assigned a dollar amount or volume. Rather, Kraft testified that Arden gave him a list of suggested inventory Kraft Piano had to have on hand. Arden and Kraft also did not agree to a specific formula to determine when Arden would be required to send Kraft customer referrals or lists nor did they set a deadline for that to occur. Kraft could also not specify what he offered in exchange for New Octave and International Piano customer lists, other than a "certain level of

Page 4 - OPINION AND ORDER

purchasing."

After his visit to Astoria, Kraft tapered off his piano repair business and made preparations to sell New Octave products, including a purchase of $44,000 - $46,000 in New Octave inventory in December 2004.  Kraft claims his inventory purchase constituted his performance of the agreement.  He also asserted that he purchased the inventory in reliance on Arden's representation that he would refer customers to Kraft Piano.  Arden testified that he had warned Kraft to purchase inventory based on Kraft Piano's sales.

Although Arden did not set specific criteria for when Kraft Piano could assume an exclusive distributorship, Kraft invested over $200,000 in preparing his business to sell New Octave products, including obtaining warehouse and office space, an order fulfillment infrastructure and a web site and computer data system.  Kraft had the web site functionality completed but did not have the site up and running because it lacked a visual interface.  Toward that end, he signed a licensing agreement with Arden that allowed Kraft to use images, descriptions and catalog materials for New Octave products on Kraft Piano's web site. Kraft also earned a certificate in piano technology.

## B.    Writings Exchanged by Kraft and Arden

In February 2005, Arden visited Kraft in Florida.  Arden, however, did not tell Kraft whether Kraft Piano's infrastructure was sufficient to assume an exclusive distributorship.[2]  Kraft expressed frustration with Arden during the trip, which prompted Arden to prepare a non-

---

[2] At oral argument, plaintiffs' counsel made much of an email from Arden to Kraft stating, "I think we're ready."  Arden's deposition testimony and the email itself, however, do not reflect that Arden was referring to an exclusive distributorship.  Rather, it appears that Arden made the statement in conjunction with the proposed licensing agreement.

binding offer to Kraft.

Shortly after his visit to Florida, Arden sent Kraft a letter of intent that contained his non-binding offer.  The letter indicated that New Octave was considering Kraft Piano as a preferred, or potentially exclusive, distributor.  The letter provided that New Octave would assist Kraft Piano "on support and product issues" but would not provide customer referrals without compensation.  The letter also indicated that, after a six-month probationary period, New Octave would consider whether to offer a "sole agency or other exclusive agreement" to Kraft Piano "based on sales volume, customer satisfaction, protocol, industry feedback and other critical conditions."  It also provided that New Octave made no guarantee to Kraft Piano "as to the future standing, association, special pricing agreements or even representation, or the assumption of " International Piano.  Among other terms, the letter also stated that, should New Octave "ultimately consider or select an alternate distributor/agent for exclusive demographic distribution within the U.S. market, [Kraft Piano] will be given ample alert and subsequently offered a first right of refusal to purchase [International Piano] outright."

On March 5, 2005, New Octave sent Kraft an offer to sell International Piano for $850,000.  The offer indicated that the $850,000 purchase price for International Piano would be reduced by $100,00 if Kraft Piano entered an "exclusive sole agency/purchasing agreement" with New Octave for sales in the United States.  The offer specified monthly minimum purchase requirements for the exclusive purchasing agreement.  The offer, however, did not include International Piano's customer lists as part of the company assets for sale.  Arden testified that the offer was the first time he articulated to Kraft a price for the sale of International Piano or a price for becoming an exclusive distributor.

Page 6 - OPINION AND ORDER

Kraft's father handled negotiations with New Octave and, on March 9, 2005, sent a written proposal on Kraft's behalf, which set a $700,000 purchase price for International Piano, which would include customer lists, along with terms for an exclusive distribution agreement between Kraft Piano and New Octave. The proposal also indicated that, if Arden did not respond by March 15, they would assume he was no longer interested in selling International Piano. Kraft does not remember whether Arden or New Octave responded to the letter. Arden indicated that he did not reply to the proposal. Arden received no further communication from Kraft or his father.

At some point, Kraft and Arden had a phone conversation that ended their business relationship. Kraft testified that Arden reminded him of the non-compete agreement during that conversation.

### C.    Kraft's Efforts to Sell New Octave Products

Kraft Piano's total revenue in 2005 was $103.36. Kraft dissolved Kraft Piano in 2005 because he did not want to incur the cost of complying with Florida's corporate filing requirements. Kraft still has most of the inventory left from his December 2004 purchase of New Octave products. He testified that he has been unable to sell that inventory because the tools were not up to the standards of those used by piano technicians, which is the market he has access to, and it would not be worth the expense to develop a market to sell to "end users." He also testified that the non-compete agreement precluded him from making sales. The agreement, however, does not include a provision relating to the resale of New Octave products. Kraft did not make any effort to sell the inventory after the non-compete agreement expired in May 2007.

**II.      Facts Relevant to the Intentional Interference With Business Relations Claim**

In the spring of 2005, Kraft Piano entered into negotiations with James Mears, the owner of Moisture King, a dehumidifier supplier, to purchase Moisture King's piano-related inventory, which made up roughly 10 percent of the total business.  During their discussions, Kraft told Mears that he had purchased a portion of a business from Arden but was unable to sell the products due to a non-compete agreement.

Arden was a Moisture King customer during the time that Kraft and Mears were discussing the sale of Moisture King's piano-related inventory.  Mears asked Arden to give him information about Kraft and Arden indicated that Kraft had a non-compete agreement with New Octave and that Mears could possibly get involved in litigation if he sold the piano-related inventory to Kraft.  Arden, however, testified that he did not specifically threaten litigation against Mears.

Arden testified that Kraft's attempted deal with Moisture King violated the non-compete agreement because it would mean that both he and Kraft would sell Moisture King products. While Mears and Kraft were still discussing an agreement, Arden called Mears and said he might be interested in purchasing Moisture King himself.  Although Arden did not purchase the business, he remains one of Moisture King's largest piano dehumidifier customers.

The negotiations between Mears and Kraft broke down in June 2005.  Mears testified that the information from Arden was not the sole reason that the sale fell apart, but that he based his ultimate decision on a variety of reasons.  Mears testified that he did not want to sell to Kraft unless Kraft could pay him in full up front and resolve the issue of the non-compete agreement. A letter from Mears to Kraft in May 2005 confirms that Moisture King would not deliver

product unless Kraft paid for it with a promissory note guaranteed by Kraft personally.  Mears is

still willing to sell his inventory to Kraft now that the non-compete agreement has expired.

Mears, however, indicated that, in his opinion, Kraft would have lost money on the deal.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact

and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Summary

judgment is not proper if material factual issues exist for trial.  *See, e.g., Celotex Corp. v.*

*Catrett*, 477 U.S. 318, 322 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995),

cert. denied, 516 U.S. 1171 (1996).  In evaluating a motion for summary judgment, the district

courts of the United States must draw all reasonable inferences in favor of the nonmoving party

and may neither make credibility determinations nor perform any weighing of the evidence.  *See,*

*e.g., Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990); *Reeves v. Sanderson Plumbing*

*Products, Inc.*, 530 U.S. 133, 150 (2000).

## DISCUSSION

### I.      Choice of Law

"When a federal court sits in diversity, it must look to the forum state's choice of law

rules to determine the controlling substantive law." *Patton v. Cox*, 276 F.3d 493, 495 (9th Cir.

2002).  In Oregon, before embarking on a choice of law analysis, a court must first determine

whether the laws of the states having a connection with the controversy are in conflict on the

particular issue. *Lilienthal v. Kaufman*, 239 Or. 1, 5, 395 P.2d 543 (1964).  "The proponent of

the law of another forum has the obligation to identify material differences between the

applicable law of Oregon and of the other forum." *Spirit Partners, LP v. Stoel Rives LLP*, 212 Or. App. 295, 301,157 P.3d 1194 (2007).

Here, the defendants have asserted that a conflict exists between Oregon and Florida law regarding promissory estoppel.  The parties, however, have not identified a conflict with regard to the interference with business relations claim.  As a result, I apply Oregon law to the interference with business relations claim.  I must, however, analyze whether to apply Oregon or Florida law to the contract cause of action.

Florida and Oregon differ in their treatment of promissory estoppel.  In Florida, a plaintiff cannot bring an action for promissory estoppel where the promise is "entirely indefinite as to terms and time." *W.R. Grace & Co. v. Geodata Servs., Inc.*, 547 So. 2d 919, 924 (Fla. 1989).  In Oregon, however, "the fact that a promise is indefinite, incomplete or even incapable of enforcement according to its own terms, does not mean that *no* redress should be possible for the damages that directly flow from the promisee's reliance on the promise." *Neiss v. Ehlers*, 135 Or. App. 218, 229, 899 P.2d 700 (1995).  Thus, a material conflict exists between Florida and Oregon law.

When the states' laws materially differ, the court must consider the states' relative connection to and interests in the litigation. *Sims Snowboards, Inc. v. Kelly*, 863 F.2d 643, 645 (9th Cir. 1988) (citing *Lilienthal*, 239 Or. at 14).  At the time the events at issue occurred, Kraft and Kraft Piano were residents of Florida and Arden and New Octave were residents of Oregon. The purported agreement arose out of Kraft's trip to Oregon.  Under that agreement, defendants were to perform in Oregon and plaintiffs were to perform in Florida.  Plaintiffs' alleged damages occurred in Florida.  Thus, the states have a  roughly equivalent relationship to the transaction.

*See Frost v. Lotspeich*, 175 Or. App. 163, 189, 30 P.3d 1185 (2001) (finding the "relative relationship" inquiry inconclusive under similar facts).

Where, as here, the states share a similar connection to the transaction, courts turn to the states' relative interests in the litigation. *Lilienthal*, 239 Or. at 14; *Frost*, 175 Or. App. at 188-89. Oregon wants to encourage citizens of other states to conduct business with Oregonians and thus has a commercial interest in ensuring that Oregonians honor their agreements. *Lilienthal*, 239 Or. at 14-15. In addition, Oregon recognizes promissory estoppel for indefinite promises to rectify "the harm that results from the promisor's inducement and the promisee's actions in reliance." *Neiss*, 135 Or. App. at 229. Florida, on the other hand, has an interest in intercepting "the frequency and success of actions based on nothing more than loose verbal statements or mere innuendos." *Tanenbaum v. Biscayne Osteopathic Hosp., Inc.*, 190 So. 2d 777, 779 (Fla. 1966) (quoting *Yates v. Ball*, 181 So. 341, 343, 132 Fla. 132 (1938)).

Here, the states' relative interests favor application of Oregon law. Defendants are residents of Oregon, which has an interest in ensuring that its citizens abide by their agreements. Florida, on the other hand, seeks to protect defendants from actions arising from indefinite oral agreements. The defendants here, however, are not Florida residents, rendering Florida's interest minimal. *See Erwin v. Thomas*, 264 Or. 454, 459, 506 P.2d 494 (1973) (where defendants were not state residents, state had little interest in the application of its law that favored defendants). Moreover, even if Oregon's interest were also minimal, Oregon law would control. *Lilienthal*, 239 Or. at 16 (where the "interests of neither jurisdiction are clearly more important than those of the other . . . in such a case the public policy of Oregon should prevail and the law of Oregon should be applied"). Therefore, I apply Oregon law to the contract claim.

Page 11 - OPINION AND ORDER

II.    **Real Party in Interest**

Under Federal Rule of Civil Procedure 17(a), "An action must be prosecuted in the name of the real party in interest." Fed. R. Civ. P. 17(a).   The real party in interest rule allows a federal court to entertain a suit at the insistence of any party to whom the relevant substantive law grants a cause of action.  *U-Haul Int'l, Inc. v. Jartran, Inc.*, 793 F.2d 1034, 1038 (9th Cir. 1986).  Thus, the real party in interest is the person who has the right to sue under the substantive law, rather than others who may merely be interested in or benefit from the litigation.  In diversity actions, state law determines whether the plaintiff is the proper party to maintain the action.  *Allstate Ins. Co. v. Hughes*, 358 F.3d 1089, 1093-94 (9th Cir. 2003).

Under Rule 17(a), however,  even if the plaintiff is not the real party in interest, joinder may cure that defect.  "The function of Rule 17(a) 'is simply to protect the defendant against a subsequent action by the party actually entitled to recover, and to insure generally that the judgment will have its proper effect as res judicata.'" *Mutuelles Unies v. Kroll & Linstrom*, 957 F.2d 707, 712 (9th Cir. 1992) (quoting Rule 17(a) advisory committee's note).  Thus, "[a]fter ratification, joinder, or substitution, the action proceeds as if it had been originally commenced by the real party in interest." Fed. R. Civ. P. 17(a).

Here, the parties dispute whether Kraft is the real party in interest when Kraft was not a party to the purported oral agreement with New Octave nor was he a party to the proposed sales agreement with Moisture King.  Kraft, however, joined Kraft Piano in the suit when he originally filed the claim.  Thus, both Kraft and Kraft Piano will be bound by the result and defendants are appropriately protected from subsequent litigation.  Therefore, assuming that Kraft is not the real party in interest, his joinder of Kraft Piano cures that defect.

III.    **Breach of Contract**

   A.    **Shareholder Liability**

   "Unless otherwise agreed, a person making or purporting to make a contract with another as agent for a disclosed principal does not become a party to the contract." *Wiggins v. Barrett & Assoc's, Inc.*, 295 Or. 679, 698, 669 P.2d 1132 (1983) (quoting Restatement (Second) of Agency § 320). Here, plaintiffs insist that Arden should be held personally liable because his agency capacity was not disclosed. Undisputed evidence, however, demonstrates that Kraft knew that Arden acted on behalf of New Octave and was merely unsure of the relationship between New Octave and International Piano. Moreover, undisputed evidence demonstrates that International Piano did not exist as a separate corporate entity during the time period relevant to this litigation. Therefore, the breach of contract claim only lies against New Octave, because Arden acted as New Octave's representative and Kraft testified that he was aware of that fact.

   Plaintiffs alternately seek to hold Arden personally liable by piercing the corporate veil. However, neither "entire management" of a corporation nor ownership of substantially all of its stock constitute an adequate basis for disregarding the corporate entity. *Wakeman v. Paulson*, 257 Or. 542, 544, 547, 480 P.2d 434 (1971). "The disregard of a legally established corporate entity is an extraordinary remedy which exists as a last resort, where there is no other adequate and available remedy to repair the plaintiff's injury." *Amfac Foods, Inc. v. Intl. Sys. & Controls Corp.*, 294 Or. 94, 103 (1982). "Thus, a shareholder may be personally liable for a corporate debt if the shareholder (1) actually controlled the corporation and (2) engaged in improper conduct that (3) caused the corporation to default on the obligation in question." *Klokke Corp. v. Classic Exposition*, 139 Or. App. 399, 405, 912 P.2d 929 (1996). Improper conduct includes

inadequate capitalization, milking the corporation through excessive dividends or

misrepresentation by holding out the corporation and the shareholder as a single enterprise.

*Amfac Foods*, 294 Or. at 109-110.  A plaintiff seeking to overcome shareholder immunity must

plead and prove specific improper conduct and demonstrate a relationship between the

misconduct and the plaintiff's injury.  *Id.* at 110.

Here, plaintiffs have neither pled nor presented evidence to demonstrate that Arden

engaged in improper conduct that resulted in New Octave defaulting on an obligation.

Moreover, piercing the corporate veil constitutes an exception to the rule of shareholder

immunity and thus is not appropriate where a plaintiff can recover under "contract, agency,

fraud, or estoppel principles."  *Id.* at 103-104.  I therefore grant summary judgment on plaintiffs'

breach of contract claims against Arden and International Piano.  As a result, under the breach of

contract cause of action, only plaintiffs' claim against New Octave remains.[3]

**B.      Mutual Assent to Essential Terms**

"Oregon subscribes to the objective theory of contract interpretation, which requires a

court to look not at the parties' subjective understandings, but at their communications and overt

acts."  *Koepping v. Tri-County Metro. Transp. Dist.*, 120 F.3d 998, 1002 (9th Cir. 1997) (citing

*City of Canby v. Rinkes*, 136 Or. App. 602, 902 P.2d 605, 610 (1995) (whether parties entered

into an agreement depends on whether the parties agreed to the same, express terms and on

whether those terms constitute an enforceable agreement); *Real Estate Loan Fund Oregon Ltd. v.*

*Hevner*, 76 Or. App. 349, 709 P.2d 727, 730 (1985) ("In determining whether a contract exists

---

[3] Even if I found that plaintiffs could proceed against Arden and International Piano, I
would grant summary judgment on those claims on the merits for the reasons set forth in my
analysis of those claims below.

and what its terms are, we examine the objective manifestations of intent, as evidenced by the parties' communications and acts.")).

Discussions, no matter how adequate, do not necessarily produce contractual relationships. *Reed v. Montgomery*, 180 Or. 196, 221, 175 P.2d 986 (1947). "A meeting of the minds upon each and all essential elements is indispensable to the creation of a contractual relationship." *Kretz v. Howard*, 220 Or. 73, 83, 346 P.2d 93 (1959). The subject matter of the agreement must be sufficiently definite to determine the nature and extent of the obligations of each party. *Klimek v. Perisich*, 231 Or. 71, 79-80, 371 P.2d 956 (1962). This principle applies to the obligation of both the plaintiff and the defendant because if the plaintiff's obligation is too indefinite, there is no mutuality. *Landgraver v. DeShazer*, 239 Or. 446, 448, 398 P.2d 193 (1965). Parties, however, may create a contract with incomplete terms if they stipulate to a formula to determine the content or value of those terms. *See Reed*, 180 Or. at 221.

In *Klimek*, for example, the court upheld the trial court's decision to set aside a jury verdict for the plaintiff, where the plaintiff's evidence could not establish that the parties agreed to sufficiently definite terms. 231 Or. at 83. The purported contract for remodeling did not specify the extent the building should be remodeled beyond the fact that it should be partitioned into a certain number of rooms. It did not, for example, specify whether remodeling required replacement of the wiring, floors and stairways. *Id.* at 81-82. Although the plaintiff asserted the minimal requirements of the city building code provided a substitute for contract terms, she presented no evidence that the parties agreed that compliance with the code would constitute satisfactory performance. *Id.*; *see also Landgraver*, 239 Or. at 448-49 (upholding trial court's grant of demurrer where contract provision required a party to build a pool but stated nothing

about the size, shape, kind or cost of the pool);  *Kretz*, 220 Or. at 82-83 (upholding trial court's refusal to grant specific performance of a land sales contract where uncertainty remained regarding amount of land and personal property included in the sale and whether the seller reserved an easement).

Here, even assuming that the parties agreed that the price list, sales history and inventory list would become part of their agreement, the purported contract still lacks sufficient detail. Kraft could not identify what deadline the parties set for Kraft Piano to be ready to take on New Octave customers or for Arden to refer those customers. Although the court may infer the parties intended a reasonable time for performance, *see Gordon v. Curtis Bros. A. D. Moodie House-Moving Co.*, 119 Or. 55, 65, 248 P. 158 (1926), other missing terms remain. Kraft, for example, could not identify what, specifically, the parties agreed to regarding the requirement that he "ramp up" Kraft Piano. Rather, Kraft testified that Arden would decide whether Kraft Piano had made sufficient efforts. Plaintiffs, however, rely on case law that implies a duty of good faith and thus demands that a party exercise its discretion in an objectively reasonable manner. *See, e.g., Western Hills, Oregon, Ltd. v. Pfau*, 265 Or. 137, 145, 508 P.2d 201 (1973); *Johnson v. School Dist.*, 210 Or. 585, 591, 312 P.2d 591 (1957).

Even if I were to imply all the terms as plaintiffs suggest, their contract claim fails because they have not presented objective evidence of mutual assent to an exclusive distributorship. Although a court may infer assent from the conduct of the parties, *see, e.g. Kitzke v. Turnidge*, 209 Or. 563, 573, 307 P.2d 522 (1957),  the conduct here does not provide the missing terms or evidence mutual assent. Kraft signed a non-disclosure agreement and a licensing agreement and Arden traveled to Florida to inspect Kraft Piano. That conduct,

however, is consistent with a distributorship agreement and does not specifically prove that Arden promised to grant Kraft Piano an exclusive distributorship along with New Octave customer lists and referrals in exchange for Kraft Piano developing its infrastructure.  Moreover, undisputed evidence indicates that Arden already had distributor agreements in place.  Finally, Kraft could not specify when the parties entered the agreement and the undisputed evidence demonstrates that the parties continued to negotiate after Kraft made his large purchase of New Octave products and made investments in Kraft Piano.

Even if Kraft had come forward with evidence of mutual assent, the purported agreement would be subject to Oregon's Statute of Frauds.  Kraft's large investment in Kraft Piano demonstrates that, if an agreement existed, the parties contemplated that it would last more than one year.  Oregon's Statute of Frauds provides that "an agreement that by its terms is not to be performed within a year of the making" is "void unless it, or some note or memorandum thereof, expressing the consideration, is in writing subscribed by the party to be charged, or by the lawfully authorized agent of the party."  Or. Rev. Stat. § 41.580(1).

Although, a party may avoid the statute if the party can demonstrate partial performance of the oral contract, *see Roadway Express, Inc. v. Jossy*, 853 F.2d 736, 739 (9th Cir. 1988) (citing *Luckey v. Deatsman*, 217 Or. 628, 633, 343 P.2d 723, 725 (1959)), a party who invokes partial performance, "must prove the agreement as well as his  part performance of it, clearly and unequivocally, by a preponderance of the evidence."  *Kretze*, 220 Or. at 83.  In other words, to defeat the Statute of Frauds through partial performance, the party must prove: 1) conduct corroborating and unequivocally referable to the oral agreement, and 2) "equitable grounds for enforcing the contract whether those grounds are found in facts establishing the basis for a true

estoppel or in facts justifying the avoidance of unjust enrichment or relief from fraud." *Roadway Express*, 853 F.2d at 739.

Plaintiffs cannot overcome the Statute of Frauds under the doctrine of partial performance because they are unable to demonstrate mutual assent to the terms of the purported oral agreement.  In addition, the plaintiffs' performance does not unequivocally refer to an exclusive distributorship but could also indicate a simple distributorship arrangement.  Thus, plaintiffs can neither prove existence of an oral agreement nor that their conduct constituted partial performance of it.

### C.    Promissory Estoppel

In Oregon "promissory estoppel is not a 'cause of action' in itself, but is a subset of and a theory of recovery in breach of contract actions." *Neiss*, 135 Or. App. at 227-28 (citations omitted); *see also Schafer v. Fraser*, 206 Or. 446, 481, 290 P.2d 190 (1955) (finding counterclaim for breach of implied warranty of authority to contract stated a cause of action for promissory estoppel).  Promissory estoppel does not apply when a valid contract exists.  *See, e.g., Hill v. Mayers*, 104 Or. App. 629, 631, 802 P.2d 694 (1990).  As a result, in *Neiss*, the court concluded that plaintiffs need not plead promissory estoppel separately from a breach of contract action.  135 Or. App. at 228 (holding promissory estoppel could be a basis of relief within plaintiff's breach of contract claim "*if* no traditional contractual remedy is available for the nonperformance"); *see also* Eric Holmes, 3 Corbin on Contracts § 8.12  n.431 (rev. ed. 1996) (explaining Oregon's approach to promissory estoppel).

Here, plaintiffs did not specifically allege a promissory estoppel claim in their First Amended Complaint.  This court generally does not consider a new claim on summary judgment

absent amendment of the pleadings.  However, the breach of contract cause of action in the

complaint, at paragraphs 19-20, includes allegations that Plaintiffs relied on the oral exclusive

distributorship agreement to their detriment and thus are sufficient to place the defendants on

notice that plaintiffs seek relief under promissory estoppel.  I will therefore consider plaintiffs'

promissory estoppel claim.  *See Roeder v. Pacificorp Fin. Servs.*, No. 05-1578, 2006 U.S. Dist.

LEXIS 79996, at *48-49 (D. Or. Oct. 27, 2006) (applying Oregon law to reach plaintiff's

promissory estoppel claim on summary judgment although it was not stated as a separate cause

of action).[4]

Under promissory estoppel, the party seeking enforcement of a promise must

demonstrate: "1) a promise, 2) which the promisor, as a reasonable person, could foresee would

induce conduct of the kind which occurred, 3) actual reliance on the promise, 4) resulting in a

substantial change in position."  *Bixler v. First Nat'l Bank*, 49 Or. App. 195, 199, 619 P.2d 895

(1980); *see also Schafer v. Fraser*, 206 Or. 446, 471-72, 290 P.2d 190 (1955).  A party may seek

relief under promissory estoppel when no valid contract exists.  *Neiss*, 135 Or. App. at 228.

Thus, promissory estoppel can defeat the Statute of Frauds.  *See Stevens v. Good Samaritan*

*Hosp. & Med. Ctr.*, 264 Or. 200, 204-207, 504 P.2d 749 (1972); *see also Potter v. Hatter Farms,*

*Inc.*, 56 Or. App. 254, 263, 641 P.2d 628 (1982) (analyzing the issue under the Uniform

---

[4] I advised the parties following oral argument that I would consider a promissory estoppel claim and allowed supplemental briefs on that issue.  Although defendants contend in their supplement brief that plaintiffs must plead promissory estoppel as a separate cause of action, defendants merely cite cases where the plaintiff chose to plead promissory estoppel separately.  *Central Oregon Ind. Health Servs., Inc. v. Oregon*, 211 Or. App. 520, 522, 156 P.3d 97 (2007); *Barnett v. Redmond Sch. Dist.*, 209 Or. App. 724, 730, 149 P.3d 250 (2006); *Gibson v. Douglas County*, 197 Or. App. 204, 212 & n.1, 106 P.3d 151 (2005).  Those cases did not address whether a plaintiff *must* plead promissory estoppel as a separate cause of action.  Rather, they merely demonstrate that a plaintiff *may* plead promissory estoppel separately.

Commercial Code Statute of Frauds).

Oregon uses the term promissory estoppel to refer to two separate concepts.   "The courts have recognized that actions taken in reliance on a definite promise may serve as a substitute for consideration even though the action was not bargained for by the promissor and was not performed as an agreed exchange for the promise." *Staley v. Taylor*, 165 Or. App. 256, 261 & n.5, 994 P.2d 1220 (2000).  Under this conception, "promissory estoppel serves as a consideration substitute [and] the plaintiff is entitled to the usual contractual remedies." *Id.* at 261 n.5.  Oregon courts have also recognized that promissory estoppel may be used when a party acts in reliance on an indefinite promise to create a binding obligation. *Id.; Neiss*, 135 Or. App. at 229.  In that situation, only reliance damages may be appropriate. *Neiss*, 135 Or. App. at 229; *see also Columbia Sportswear of N. Am., Inc. v. CERF Bros. Bag Co.*, No. 05-1960, 2007 U.S. Dist. LEXIS 5654, at *7 (D. Or. Jan. 25, 2007) (no lost profits damages available where promises were indefinite because they encompassed three distinct possibilities and were devoid of details as to terms).   Here, plaintiffs assert only the latter concept of promissory estoppel.

### 1.    Existence of a Promise

The parties dispute whether New Octave promised to grant an exclusive distributorship or customer referrals to Kraft Piano.  Kraft insists that he invested in Kraft Piano in reliance on New Octave's promise to grant an exclusive distributorship and customer referrals once Kraft "ramped up" Kraft Piano.  Arden contends that he and Kraft merely had discussions about the possibility of an exclusive distributorship.  Thus, a question of fact exists regarding the existence of a promise. *See Twin City Fire Ins. Co. v. Philadelphia Life Ins. Co.,* 795 F.2d 1417, 1430 (9th Cir. 1986) (whether insurance broker's quote constituted a promise was a question of fact where

broker said that the quote was not confirmed but also said that it could be relied on). This question of fact is material, however, only if Arden could reasonably foresee that Kraft would rely on the alleged promise.

### 2.    Reasonably Foreseeable Reliance

Oregon law acknowledges that, "the facts of specific cases may be such that the promise is not only too indefinite for enforcement as a contract, but is so illusory that it could not reasonably have been acted on or foreseen as an inducement to action." *Neiss*, 135 Or. App. at 229. A promise is illusory when the promisor has an unconditional power to refuse to perform. *See Shannon v. Mathers*, 271 Or. 148, 152, 531 P.2d 704 (1975). Thus, I must decide whether the promise here was so indefinite that New Octave could not foresee Kraft's reliance.

The Oregon courts have upheld promissory estoppel claims arising from indefinite promises made by employers to their employees. In *Neiss*, for example, an indefinite promise was not too illusory to support promissory estoppel. 135 Or. App. at 229. The defendants promised the plaintiff, an optician, a one-third ownership interest "through the establishment of an S corporation and/or in a manner agreed upon" in exchange for her "skills and contributions" to their optometry practice. *Id.* at 221. Similarly, in *Roeder,* the court held that an employee could have reasonably relied on his employer's promise to adopt a long-term incentive plan, although the timing and nature of the plan were undecided. 2006 U.S. Dist. LEXIS 79996 at *51-52. Moreover, in *Furrer v. Southwestern Oregon Community College*, the court held that employees stated a claim for promissory estoppel where they alleged a promise by their employer to allow early retirement when it was "mutually beneficial." 196 Or. App. 374, 381,103 P.3d 118 (2004). The court in *Furrer* reasoned that defendant's promise implied that the

defendant would act in good faith and thus apply objectively reasonable standards to the question

of whether an employee could receive early retirement.  *Id.* at 382.

Thus, in *Neiss, Roeder* and *Furrer*, the courts found employees foreseeably relied on

their employers' promises by taking or remaining on the job.  In *Neiss*, for example, the plaintiff

moved to a new town to join the defendant's optometry practice.  135 Or. App. at 221.  Similarly,

in *Roeder*, the plaintiff turned down a job offer in favor of remaining in the defendant's employ.

2006 U.S. Dist. LEXIS 7996 at *14, 51-52.

Plaintiffs, however, point to no Oregon case, nor could this court find one, where a party

negotiating at arms' length foreseeably relied on an indefinite promise.  Moreover, the cases cited

by the Oregon Court of Appeals in *Neiss* as support for promissory estoppel relief on an

indefinite promise do not resemble the facts here.  In those cases, the defendants could foresee

the plaintiffs' reliance because they made a specific promise, *Vigoda v. Denver Urban Renewl

Auth.*, 646 P.2d 900, 904-905 (Colo. 1982) (promise to negotiate in good faith for 90 days), or

specifically requested the plaintiffs' actions in reliance on an indefinite promise, *Kiely v. St.

Germain*, 670 P.2d 764, 765 (Colo. 1983) (defendant told plaintiff to quit his job); *Hoffman v.

Red Owl Stores, Inc.*, 26 Wis. 2d 683, 133 N.W.2d 267 (1965) (defendant advised plaintiff to sell

his grocery store, make a down payment on a plot of land, and to sell his bakery business); *see

also C & K Eng'g Contractors v. Amber Steel Co.*, 23 Cal. 3d 1, 5, 587 P.2d 1136 (1978)

(defendant sub-contractor promised that work would be performed for bid price and plaintiff

general contractor foreseeably relied on the promise in submitting the project bid).

The case law above leads me to conclude that the promise here falls outside the limits

that *Neiss* imposed on promissory estoppel relief because it is  "so illusory that it could not

reasonably have been acted on or foreseen as an inducement to action." 135 Or. App. at 229. To

conclude otherwise would allow a promissory estoppel claim in almost every case where a

plaintiff alleges that he or she relied on a promise – no matter how indefinite. Unlike the cases

above, plaintiffs have not presented evidence to demonstrate that New Octave could reasonably

foresee that Kraft would make certain investments in warehouse space, office space and

computer systems in reliance on the alleged promise. The promise is indefinite because New

Octave did not have to honor it unless Arden decided, at his discretion, that Kraft Piano had

developed sufficient infrastructure to handle New Octave's order volume. New Octave set no

criteria or deadline for Kraft Piano to assume an exclusive distributorship and, at the time of the

alleged promise, had other distribution agreements in place. Moreover, nothing indicates that

Kraft told New Octave of his plans to invest in warehouse space and office space and computer

systems, or that New Octave asked Kraft to make those investments. Kraft has not presented

evidence that his investments were so logical and reasonable such that New Octave must have

known that Kraft would undertake them. Thus, plaintiffs have not established foreseeable

reliance.

### 3.        Breach of the Promise

Relief under promissory estoppel requires evidence that the defendant breached the

promise. *See Vincent Constr. & Insulation, Inc. v. Milton-Freewater Orchard Homes, Inc.*, No.

03-1207, 2004 U.S. Dist. LEXIS 6985, at *23 (D. Or. April 12, 2004) (applying Oregon law and

granting summary judgment were plaintiffs did not present evidence to show defendants

breached the promise); *Schafer*, 206 Or. at 472. Here, plaintiffs have not presented evidence that

New Octave breached its alleged promise to grant Kraft Piano an exclusive distributorship once

Kraft Piano had developed sufficient infrastructure.  The undisputed evidence indicates that,

when Arden visited Florida, Kraft Piano's web site was not yet completed.  In addition, Kraft

Piano bought a large amount of New Octave inventory but had yet to make any sales.  Thus,

New Octave had objective reasons to find that Kraft Piano did not have sufficient infrastructure.

Plaintiffs cannot demonstrate a breach because the promise contained no deadline or criteria,

and, even if this court assumes objective criteria applied, New Octave appeared to have a good

faith basis to deny an exclusive distributorship.

        In conclusion, the indefinite promise here plagues plaintiffs' efforts to prove both

foreseeable reliance and breach.  Plaintiffs have not overcome this deficiency with evidence

demonstrating that the investments in Kraft Piano were logical and reasonable or that they met

objective requirements for sufficient infrastructure to assume an exclusive distributorship.  As a

result, I grant defendant's motion for summary judgment on plaintiffs' contract cause of action

## IV.    Intentional Interference With Business Relations

        Plaintiffs alleged that Arden intentionally interfered with the prospective business

relationship between Kraft Piano and Moisture King when he spoke to Mears about the non-

compete agreement.  To prevail on their claims of intentional interference with business

relations, plaintiffs must establish: 1) the existence of a valid prospective or existing contract or

business relationship; 2) intentional interference with that relationship; 3) by a third party; 4)

accomplished through improper means or for an improper purpose; 5) a causal effect between

the interference and the harm to the relationship or contract; and 6) damages.  *McGanty v.*

*Staudenraus*, 321 Or. 532, 535, 901 P.2d 841 (1995).

Page 24 - OPINION AND ORDER

### A.    Valid Prospective Business Relationship

A plaintiff asserting an intentional inference with business relations claim, must, as an initial matter, establish "a reasonable expectancy of entering into a valid business relationship." *Erlandson v. Pullen*, 45 Or. App. 467, 471, 608 P.2d 1169 (1980).  Here, the facts, read in the light most favorable to plaintiffs, establish a reasonable expectancy of entering into a valid business relationship.  Mears testified that he would have sold to Kraft Piano if Kraft had the money up front to purchase the inventory and could resolve the issue with the non-compete agreement.  The writings exchanged by Kraft and Mears confirmed that Mears was willing to sell if Kraft could pay.  Thus, plaintiffs presented sufficient evidence to meet this element.

### B.    Intentional Interference With an Improper Purpose or by Improper Means

To satisfy the intent requirement in a claim for intentional interference with economic relations, a plaintiff must show the defendant desired to interfere with a business relationship or contract or knew the interference was certain or substantially certain to occur.  *Straube v. Larson*, 287 Or. 357, 360, 600 P.2d 371 (1979); *Top Service Body Shop, Inc. v. Allstate Insurance Co.*, 283 Or. 201, 207 & n.8, 582 P.2d 1365 (1978).   Moreover, plaintiffs must prove the interference resulting in injury "is wrongful by some measure beyond the fact of the interference itself."  *Top Service Body Shop*, 283 Or. at 208.  To establish improper purpose, a plaintiff must prove the defendant acted with intent to injure the plaintiff.  *Id.* at 210; *see also Uptown Heights Assocs. v. Seafirst Corp.*, 320 Or. 638, 652, 891 P.2d 639 (1995).  Improper means, on the other hand,  "may be wrongful by reason of a statute or other regulation, or a recognized rule of common law, or perhaps an established standard of a trade or profession."  *Top Service Body Shop*, 283 Or. at 209-210.   Such acts may include "violence, threats or other

intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falsehood." *Id.* at 210 n.11.

A person, however, who intentionally interferes with a competitor's contractual relation does not improperly interfere if: 1) the relation concerns a matter involved in the competition; 2) the actor does not employ wrongful means; 3) his action does not create or continue an unlawful restraint of trade; and 4) his purpose is at least in part to advance his competitive interest. *Douglas Med. Ctr. LLC v. Mercy Med. Ctr.*, 203 Or. App. 619, 631,125 P.3d 1281 (2006); *see also  Ron Tonkin Gran Turismo, Inc. v. Wakehouse Motors, Inc.*, 46 Or. App. 199, 212, 611 P.2d 658 (1980) (reversing judgment for the plaintiff where the defendant convinced an auto manufacturer not to enter agreement with the plaintiff, because the defendant sought, at least in part, to maintain its competitive position as the  manufacturer' sole local dealer).

Plaintiffs have failed to establish that Arden acted with an improper purpose or used improper means.  Undisputed evidence indicates that Arden was a Moisture King customer at the time of the proposed deal between Kraft and Moisture King.  Arden, therefore had an interest in avoiding competition in dehumidifier sales and thus did not act solely to injure Kraft or Kraft Piano.  Moreover, although Arden's threat to exercise his rights under non-compete agreement could constitute improper means if that agreement was an illegal restraint on trade, plaintiffs did not argue that point.  In any event, even if plaintiffs were able to establish improper purpose or means, their claim fails for lack of evidence of damages.

### C.    Causation and Damages

 The plaintiff bears the burden to establish the defendant's interference caused the disruption of the business relationship and that damages resulted.  *Northwest Natural Gas co. v.*

*Chase Gardens, Inc.* 328 Or. 487, 501, 982 P.2d 1117 (1999).  Here, plaintiffs failed to establish whether Arden's statements caused injury because Mears testified that Kraft himself told him of the non-compete agreement.  More importantly, plaintiffs presented no evidence to rebut Mears' opinion that Kraft would have lost money on the proposed deal.  Even if the agreement would have allowed Kraft to use the business infrastructure he built for Kraft Piano, the undisputed evidence indicates he would have operated at a loss.  Thus, plaintiffs failed to establish damages. I therefore grant defendants' motion for summary judgment on the intentional interference with business relations claim.

## CONCLUSION

Defendants' motion for summary judgment (#47) is granted.  The case is dismissed with prejudice.  Any other pending motions are denied as moot.

IT IS SO ORDERED.


Dated this 7th day of November, 2008.


                     /s/ Paul Papak            
                     Honorable Paul Papak
                     United States Magistrate Judge